IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CLASSIC AVIATION HOLDINGS LLC and CLASSIC AIR CARE LLC, d/b/a CLASSIC AIR MEDICAL and d/b/a CLASSIC LIFEGUARD,<br><br>　　　Plaintiffs,<br><br>v.<br><br>KIM HARROWER and GRETCHEN SCHMID,<br><br>　　　Defendants. | **MEMORANDUM DECISION AND ORDER IMPOSING RULE 11 SANCTIONS AND DENYING MOTION FOR ATTORNEYS' FEES**<br><br>Case No. 2:20-cv-00824-RJS<br><br>Chief District Judge Robert J. Shelby |

　　　Believing two of their former employees surreptitiously competed with them before leaving the company, Plaintiffs sought to file suit against their former employees, a Wyoming company the employees allegedly formed as a competitor, and a Georgia doctor who Plaintiffs believed was financing the competing venture. Plaintiffs hired skilled, experienced counsel to prepare and prosecute a lawsuit in this court. Those lawyers appropriately conducted a pre-lawsuit investigation. That investigation yielded no evidence the Georgia doctor had any meaningful contacts with the State of Utah. The lawyers nevertheless prepared and filed a lawsuit in which they alleged that all the defendants had engaged in "regular and substantial business in the State of Utah." The lawyers knew they had no factual basis to make that allegation against the Georgia doctor but did so anyway. This was a clear breach of their duties as lawyers and officers of the court. It is the kind of conduct that harms citizens and undermines confidence in judicial proceedings.

Now before the court is Plaintiffs' Response to the court's Order to Show Cause concerning potential Federal Rule of Civil Procedure 11 violations.[1]  For the reasons explained below, the court concludes Plaintiffs' counsel violated Rule 11.  Also before the court is Defendants' Motion for Attorneys' Fees.[2]  For the reasons explained below, that Motion is denied.

## BACKGROUND

This case arose from a dispute between Plaintiffs Classic Aviation Holdings LLC and Classic Air Care LLC, d/b/a Classic Air Medical and d/b/a Classic Lifeguard (collectively, Classic) and two of Classic's former employees, Defendants Kim Harrower and Gretchen Schmid.  Classic, an air medical services company based in Utah, tasked Harrower (a pilot) and Schmid (a nurse) with implementing its business plan to establish a new base of operation in Jackson Hole, Wyoming, a "critical new market" for Classic.[3]  Classic had spent six years and millions of dollars researching, building relationships, and securing licenses and contracts to launch the potentially lucrative Jackson Hole operation.[4]  Classic alleged Harrower and Schmid, while still employed by Classic, worked to establish a competing venture in Jackson Hole, Mountain Air Medical, LLC, funded by Dr. Gary Roubin.[5]  Classic further alleged that Defendants, in working to establish Mountain Air Medical, used confidential information from Classic, sought to poach employees, and even took a valuable space at the Jackson Hole airport hangar meant for Classic.[6]

---

[1] Dkt. 65 (Response to Order to Show Cause).

[2] Dkt. 55 (Motion for Attorneys' Fees).

[3] Dkt. 2 (Initial Complaint) ¶ 2.

[4] *Id.* ¶¶ 2, 45.

[5] *Id.* ¶ 4.

[6] *Id.* ¶ 5.

Represented by the law firms Gibson, Dunn, & Crutcher and Magleby Cataxinos & Greenwood, Classic filed suit in November 2020, shortly before Defendants' anticipated launch of Mountain Air Medical as early as the following month.[7]

## PROCEDURAL HISTORY

A detailed account of the procedural history is provided to supply context for the substantive discussion that follows.

## I.     The Initial Complaint and Motion for Temporary Restraining Order

On November 20, 2020, Classic filed the above-captioned action against Defendants Kim Harrower, Gretchen Schmid, Gary Roubin, and Mountain Air Medical, LLC,[8] together with a simultaneous Motion for a Temporary Restraining Order.[9]  November 20 was the Monday before Thanksgiving.  The court is aware that a high volume of complaints and TROs tend to be filed during the holiday season.  At times, those motions and applications for TRO are designed to harass and oppress the other side.  Sometimes, the timing of the filings of those motions is unnecessary in view of the facts that are known and available to counsel.  At the same time, sometimes it is unavoidable that an action is initiated and emergency injunctive relief is sought during the holiday season.  The court makes no judgment about the timing of the filing except to note it was potentially concerning given the aforementioned issues observed in other cases and the fact that Classic later abandoned the Motion notwithstanding its argument it would be irreparably harmed unless an emergency order issued.

In its Initial Complaint, Classic asserted ten separate causes of action, including claims for breach of contract, breach of the covenant of good faith and fair dealing, various tort claims,

---

[7] *Id.* ¶ 5.

[8] *Id.*

[9] Dkt. 9 (Motion for Temporary Restraining Order and Preliminary Injunction) (hereinafter Motion for TRO).

and both state and federal misappropriation of trade secrets claims.[10]  Classic alleged the court

enjoyed subject matter jurisdiction under both and 28 U.S.C. § 1331[11] and 28 U.S.C. § 1332.[12]

In addition to restitution, lost profits, and punitive damages,[13] Classic asserted emergency

injunctive relief was necessary to prevent irreparable harm to its Jackson Hole venture.[14]  In fact,

Classic alleged that immediate injunctive relief would be necessary to prevent the impending

December 2020 launch of Mountain Air Medical.[15]

### A.  Personal Jurisdiction Allegations

Classic maintained the court had personal jurisdiction over all Defendants "because

Defendants are engaged in regular and substantial business in the State of Utah and the District

of Utah."[16]  At the time, the court found that statement to be ambiguous in a way that was

potentially troubling.  As explained below, the court now knows this statement was false and that

Classic's counsel (Counsel) knew it was false when they made the allegation.  Classic's pre-suit

investigation yielded no evidence that Defendant Roubin had any contacts with the State of Utah.

Indeed, the same paragraph asserting the court's personal jurisdiction over each Defendant only

specifically stated that Defendants Harrower and Schmid "traveled to and/or directed their

activities into this jurisdiction in connection with their employment."[17]  As to Defendant Roubin,

---

[10] *See* Initial Complaint ¶¶ 75–103.

[11] *Id.* ¶ 14 (asserting federal question jurisdiction because one of the causes of action arose under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*).

[12] *Id.* (asserting complete diversity of citizenship existed among the parties and that the amount in controversy exceeded $75,000).

[13] *Id.* at 31 (Prayer for Relief).

[14] *Id.* ¶¶ 6–7; *see also id.* ¶¶ 68–74 (stating irreparable harm will occur absent an injunction).

[15] *Id.* ¶¶ 6–7.

[16] Initial Complaint ¶ 15.  Classic also argued the court had personal jurisdiction over Defendants under Utah Code § 78B-3-205(1)-(3) "because Defendants transact business in Utah, contract to supply services or goods in Utah, and threaten to cause injury, are causing injury, and/or have caused injury to Classic in Utah."  *Id.*

[17] *Id.*

Classic alleged he was a resident of Alabama and Wyoming, and that "[o]n information and belief," he was the principal financial backer of Mountain Air Medical.[18]  The Initial Complaint contained no specific factual allegations tying Roubin to Utah.

### B.  Breach of Contract Allegations

Classic's breach of contract claims were based in part on the assertion that a "valid and enforceable contract[]" was formed by Classic's Employee Handbook (the Handbook), which contained provisions concerning non-disclosure, business ethics, and conflicts of interest, and also contained an Employee Acknowledgement Form for employees to sign.[19]  The Initial Complaint quoted extensively from the Handbook,[20] and asserted that "[b]oth Harrower and Schmid" were bound by it,[21] despite alleging only that Harrower had signed the Acknowledgment Form.[22]

Classic also alleged both Harrower and Schmid were bound by a Confidentiality Agreement which all employees purportedly signed, but only specifically alleged Schmid signed the Confidentiality Agreement.[23]  The Initial Complaint did not attach as an exhibit a copy of either alleged contract.[24]  While it is not required that any litigant asserting a claim for breach of contract attach the actual document, because the Initial Complaint quoted so extensively from

---

[18] *Id.* ¶ 13.  Later in the Complaint, Classic more specifically alleges the sums Roubin invested in Mountain Air Medical along with his ties to the medical community in Jackson, Wyoming.  *See id.* ¶¶ 59–62.

[19] *Id.* ¶¶ 27–34.

[20] *See id.*

[21] *Id.* ¶ 76.

[22] *Id.* ¶ 34.

[23] *Id.* ¶¶ 35–36, 76.  The Amended Complaint asserts substantially identical allegations concerning Breach of Contract.  *See* Dkt. 29 (Amended Complaint) ¶¶ 26–38, 77–82.

[24] *See generally id.*

both documents but did not attach either document, the court found the exclusion of the documents at the time notable.

### C.  Motion for TRO/Preliminary Injunction

The same day it filed the Initial Complaint, Classic filed a Motion for Temporary Restraining Order and Preliminary Injunction (TRO).[25]  The Motion stated Classic had learned of Defendants' actions within the previous two weeks, Defendants aimed to launch their Jackson Hole operation "as soon as December 2020,"[26] and the extraordinary relief of a TRO was necessary to prevent irreparable harm to Classic's Jackson Hole operation.[27]

The Motion for TRO asserted Classic was "substantially likely" to succeed on the merits of all claims in the Initial Complaint.[28]  As to the breach of contract claim against Harrower and Schmid, Classic asserted that "both parties physically signed agreements manifesting an intention to bargain," those agreements were supported by the consideration of continued at-will employment, and Classic performed its end of the bargain by employing Defendants.[29]  Classic further asserted that Defendants breached the terms of the agreements by misappropriating confidential information and seeking to start a competing business.[30]  Thus, a contract was formed by the parties' "manifestation of mutual assent, by words or actions or both, which reasonably are interpretable as indicating an intention to make a bargain."[31]

---

[25] Dkt. 9 (Motion for Temporary Restraining Order and Preliminary Injunction) (hereinafter Motion for TRO). Classic also filed a Motion for Expedited Discovery on November 25, 2020.  *See* Dkt. 21.

[26] Motion for TRO at 2.

[27] *Id.* at 3–5 (summarizing argument for relief).

[28] *Id.* at 12.

[29] *Id.* at 13–14.

[30] *Id.* at 14.

[31] *Id.* at 13 (citing *Xyngular Corp. v. Innutra, LLC*, No. 2:13-cv-685-TS, 2013 WL 6916525, at *2 (D. Utah Nov. 20, 2013)).

However, most of the application for TRO focused on the likelihood of success on the merits on the trade secret claims, and the court focused much of its initial attention on the misappropriation of trade secrets claims.[32]  On November 25, 2020, the day before Thanksgiving, the court held an emergency status and scheduling conference on the TRO.[33]  The court set an expedited briefing schedule for the Motion for TRO, in preparation for a hearing on the merits to take place December 21, 2020.[34]  The court explained its usual practice of requiring an applicant for a TRO on the basis of trade secrets to make an initial disclosure more specifically identifying the trade secrets, so that defendants can respond in kind.  Rather than proceed in the manner directed by the court, Classic eventually voluntarily withdrew its TRO Motion without making any trade secret disclosure.[35]  When the Motion for TRO was withdrawn, the court found it notable that despite the language in the Initial Complaint and TRO Motion, it was apparently no longer urgent for Classic to obtain immediate injunctive relief, and despite the fact that nothing seemed to have changed since filing of the Initial Complaint and application for TRO—save for Defendants having to obtain representation to appear at a hearing on two days' notice the week of Thanksgiving.  Classic later asserted that it withdrew the Motion because of the court's requirement that Classic identify the assorted trade secrets with sufficient particularity to enable Defendants to defend the claim at the scheduled hearing on Classic's TRO application.[36]

---

[32] *Id.* at 7–9, 11–12, 15–17 (asserting the impending release of Classic's trade secrets will cause irreparable harm, the public interest is served by protecting fair and honest competition, and likelihood of success on the merits of misappropriation trade secrets claims).

[33] *See* Dkt. 26 (Minute Entry for TRO Scheduling Hearing).

[34] *Id.*

[35] Dkt. 33 (Withdrawal of Motion).

[36] *See* Dkt. 66 (Minute Entry for Motion for Attorneys' Fees Hearing).

During the TRO status and scheduling conference the night before Thanksgiving, the court raised concerns about the personal jurisdiction allegations in the Initial Complaint—specifically noting that while Paragraph 15 stated that all Defendants were "engaged in regular, substantial business in the State of Utah and the district of Utah," there were no factual allegations in the Initial Complaint concerning any contacts Mountain Air Medical or Roubin had with the State of Utah.[37]

## II.    The Amended Complaint and Motion to Dismiss

On December 8, 2020, Classic filed an Amended Complaint, dismissing two Defendants—Roubin and Mountain Air Medical—and dropping its state and federal misappropriation of trade secrets claims entirely.[38]  Given the discussion that had taken place at the emergency hearing in November concerning personal jurisdiction, the court found the changes notable.  Because the trade secret claims featured so prominently in the application for TRO filed only a couple weeks earlier, that was also notable.

After dropping the federal misappropriation of trade secrets claim, Classic invoked diversity as the sole basis for subject matter jurisdiction.[39]  The court failed to notice that when Classic filed its Amended Complaint.

On December 28, 2020, remaining Defendants Harrower and Schmid filed a Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, and Failure to State a Claim.[40]  Defendants attached the entire Classic Aviation Employee Handbook as an exhibit to their

---

[37] *See* Minute Entry for TRO Scheduling Hearing.  Because personal jurisdiction is subject to waiver, the court rarely raises the issue sua sponte except when asked to enjoin out-of-District individuals who have not yet had an opportunity to raise the issue.

[38] *See* Amended Complaint.  Without the federal misappropriation of trade secrets claim, the court no longer had subject matter jurisdiction under 28 U.S.C. § 1331.

[39] *See id.* ¶ 13.

[40] Dkt. 31 (Motion to Dismiss).

Motion, along with the associated Employee Acknowledgement Form.[41]  Defendants argued the Handbook expressly disclaimed any contractual relationship, and therefore Classic could not assert that Defendants were liable for breaching it.[42]

Specifically, Defendants identified the following disclaimers within the Handbook.  First, the Employee Acknowledgement Form contains four unboxed paragraphs, a boxed section titled "AT-WILL DISCLAIMER" followed by three bolded paragraphs, and a signature line.[43]  The final unboxed paragraph states: "I acknowledge that this handbook is neither a contract of employment nor a legal document."[44]  The second paragraph of the boxed, bolded "AT-WILL DISCLAIMER" section further states: "This Manual is for general guidance only.  The policies and procedures expressed in this manual, as well as those in any other personnel materials which may be issued from time to time, do not create a binding contract or any other obligation or liability on Classic Aviation."[45]  Finally, on the first substantive page of the Handbook, under a section titled "101 Employment," the second paragraph states: "Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between Classic Aviation and any of its employees."[46]

In opposition to Defendants' Motion to Dismiss, Classic argued the statement in the Acknowledgment Form that the Handbook "is neither a contract of employment nor a legal

---

[41] Dkt. 31-3 (Exhibit A-2: Employee Acknowledgment Form); Dkt. 31-4 (Exhibit A-3: Classic Aviation Employee Handbook).

[42] Motion to Dismiss at 13 (citing Exhibit A-3: Classic Aviation Employee Handbook at 9).

[43] Exhibit A-2: Employee Acknowledgment Form.

[44] *Id.*

[45] *Id.*

[46] Exhibit A-3: Classic Aviation Employee Handbook at 12.

document" was not relevant to the assertions in the Amended Complaint.[47]  Rather, the Amended

Complaint asserted that the Handbook itself "sets forth standards and a code of conduct to which

employees agree to adhere," and therefore "a triable issue" existed in terms of whether the

parties manifested assent to the standards and code of conduct in the Handbook.[48]  Classic also

argued that "the mere presence of a disclaimer does not serve as a per se release of all liability"

under Utah contract law.[49]  To support this proposition, Classic cited *Reynolds v. Gentry*

*Financial Corporation and Royal Management*, a 2016 Utah Court of Appeals case: "because a

contractual disclaimer was not 'placed at the top of the relevant policy, not prominent, not

bolded, and not set apart by a text box,' it was inconspicuous and created a triable issue as to

whether a contract existed."[50]

### III.   Order to Show Cause re: Jurisdiction

On May 3, 2021, the day before a scheduled hearing on Defendants' Motion to Dismiss,

the court ordered Classic to show cause why the case should not be dismissed for lack of subject

matter jurisdiction due to Classic's failure to sufficiently plead the citizenship of Plaintiffs

Classic Aviation Holdings LLC and Classic Air Care LLC.[51]  The Amended Complaint alleged

---

[47] Dkt. 40 (Opposition to Motion to Dismiss) at 24.

[48] *Id.* at 24–25.

[49] *Id.* at 24.  Classic asserted the state law claims were governed by Utah law, *id.* at 22–24, while Defendants asserted Wyoming law governed, Motion to Dismiss at 12–13.  At this stage, the court need not evaluate the choice of law issue, but instead examines Classic's factual and legal assertions assuming for the sake of argument that Utah law applies.

[50] Opposition to Motion to Dismiss at 24–25 (citing *Reynolds v. Gentry Fin. Corp. & Royal Mgmt.*, 368 P.3d 96, 101 (Utah Ct. App. 2016)).  Defendants also cite a Tenth Circuit case interpreting Wyoming state law for the same proposition.  *See id.* at 25 (citing *Durtsche v. Am. Colloid Co.*, 958 F.2d 1007, 1010–11 (10th Cir. 1992)).  In Reply, Defendants argued that because Classic's disclaimer was conspicuous and unambiguous, both *Reynolds* and *Durtsche* were inapposite.  *See* Dkt. 44 (Reply) at 9.

[51] Dkt. 50 (Order to Show Cause re: Jurisdiction).

Plaintiffs' citizenship on the basis of state of incorporation and principal place of business, not on the basis of the citizenship of each of the LLC's members, as required.[52]

In response, Classic informed the court on May 4, 2021 that, based on "newly discovered information," it determined that one of the subsidiary members of Plaintiff Classic Aviation Holdings LLC was a citizen of Wyoming, which destroyed complete diversity.[53]  Due to this discovery, Classic stated it intended to voluntarily dismiss this action and re-file it in a different court.[54]  Consequently, the court dismissed the case without prejudice for lack of subject matter jurisdiction.[55]

The court issues orders to show cause regarding diversity jurisdiction regularly, as parties often plead diversity without properly pleading the citizenship of an LLC (as opposed to a corporation).  The court, therefore, did not necessarily find it unusual that Classic had failed to establish the basis for diversity jurisdiction in its Amended Complaint.  The court did observe it was yet another notable event in the case, especially because Counsel are seasoned and skilled attorneys.

During a brief hearing on May 4, 2021, just before the case was closed, the undersigned expressed concern about possible Rule 11 violations by  Counsel based on the breach of contract claims.[56]  The court explained that because the breach of contract claims were likely the only basis for finding venue in Utah, it had examined the claims more closely in evaluating Defendants' Motion to Dismiss and was concerned Classic had asserted breach of contract

---

[52] *See id.* at 2 (citing *Grynberg v. Kinder Morgan Energy Partners, L.P.*, 805 F.3d 901, 905 (10th Cir. 2015)).

[53] Dkt. 51 (Response to Order to Show Cause re: Jurisdiction).

[54] *See id.*

[55] Dkt. 52 (Order Dismissing Case).

[56] *See* Dkt. 55-2, Ex. 2: 05-05-2021 Hearing Transcript at 4:21–5:7, 7:21–8:15.

claims that had no basis under existing Utah law.  At that time, the court raised at least the possibility that related issues may be something to consider as the case moved forward in another forum.[57]

### IV.   Motion for Attorneys' Fees and Order to Show Cause re: Rule 11

On May 18, 2021, Defendants filed a Motion for Attorneys' Fees, arguing they are entitled to recover their fees incurred "defending against the baseless contract and contract-related claims asserted" by Classic.[58]  Specifically, Defendants argue that by asserting a breach of contract claim arising out of the Handbook (drafted by Classic) which "conspicuously" stated it was "neither a contract of employment nor a legal document," Classic had acted in bad faith.[59]  Defendants further argue Classic only "doubled down" on the claims in its Opposition to the Motion to Dismiss, despite Defendants attaching the Handbook and noting its disclaimers.[60]

In its opposition to the Motion for Attorneys' Fees, Classic states it alleged a colorable contract claim against Schmid arising from the Confidentiality Agreement, and admitted it "alleged weaker, though non-frivolous, contract claims against Harrower."[61]  Classic first argues its allegation that both Defendants were bound by both agreements was colorable on the basis of *Xyngular Corp. v. Innutra, LLC*,[62] because that court found sufficient grounds for a contract on allegations that the parties assented to the terms of an agreement, began operating under its terms, and believed they were in a contractual relationship, even when the agreement was never signed or reduced to writing.  Classic argues that, on this basis, it was appropriate to allege

---

[57] *Id.* at 8:12-15.

[58] Dkt. 55 (Motion for Attorneys' Fees) at 1.

[59] *Id.* at 1–2.

[60] *Id.* at 8.

[61] Dkt. 56 (Opposition to Motion for Attorneys' Fees) at 6.

[62] 2013 WL 6916525, at *2.

breach of contract: "employees are not free to betray their employer and abuse company information simply because there may be deficiencies in the written documents that set forth basic standards of professionalism and loyalty."[63]

In its Opposition Memorandum, Classic also discusses case law it argues lends support to the breach of contract claim arising out of the Handbook—despite the Handbook's disclaimer of contractual liability.  First, Classic provides a fuller discussion of *Reynolds*, citing it for the proposition that an employee manual may create a unilateral contract under Utah law, and highlighting that in *Reynolds*, a triable issue arose as to whether a disclaimer operated to void the contract created by the manual when the manual also contained "repeated assurances that no employee will be terminated for submitting a complaint or grievance."[64]   Next, Classic cites three cases, not cited in the Opposition to the Motion to Dismiss, for additional support.  Classic cites *First American Title Insurance Company v. Northwest Title Insurance Agency, LLC*, which states: "In the at-will setting, the employer can unilaterally change compensation and the employee's duties."[65]   Next, Classic cites *Bradley v. Lopez*, a New Mexico case which held "there can be a basis for finding an implied-in-fact contract despite express language in the employee handbook that it does not create an employment contract."[66]   Finally, Classic cites *Powell Products Inc. v. Marks*, a Colorado case holding that even where an employment

---

[63] Opposition to Motion for Attorneys' Fees at 6.  Classic further argues that even if the claims are weak, the proper course of action is to "dismiss them—not award attorneys' fees."  *Id.*

[64] *Id.* at 7 (citing *Reynolds*, 368 P.3d at 99–101).

[65] No. 2:15-cv-00229-DN, 2016 WL 6902473, at *14 (D. Utah Nov. 23, 2016).  Notably, the cited portion is a quotation from *Ryan v. Dan's Food Stores, Inc.*, a 1998 Utah Supreme Court case considering whether the terms of an employment manual which stated employment was at-will could be enforced against an employee who claimed a previous verbal agreement guaranteed any firing would only be for cause.  972 P.2d 395, 401 (Utah 1998).  *Ryan* and *First American* stand for the proposition that an employer can avoid being bound by verbal contracts with its employees if a later written policy clearly states employment is at-will.

[66] Opposition to Attorneys' Fees at 7 (citing No. CIV 99-1149 MV/LFG, 2000 WL 36739485, at *5 (D.N.M. Sept. 18, 2000).  The *Bradley* case also arose in the context of an employee seeking to enforce terms of the employment manual despite a disclaimer.  *See Bradley*, 2000 WL 36739485, at *5.

handbook does not create a contract because it contains a disclaimer, a nondisclosure provision within it may still be enforceable.[67]  Classic also argues there was no evidence of bad faith sufficient to merit an award of attorneys' fees, noting it was not required to attach a copy of the contract at issue to the Initial Complaint.[68]

After reviewing Defendants' Motion and considering the foregoing procedural history and the court's mounting concerns with Classic's litigation practice, the court, pursuant to Federal Rule of Civil Procedure 11(c)(3), ordered Counsel to show cause why sanctions should not be imposed against them under Rule 11(b).[69]  Counsel were directed to address the following matters:

1. What reasonable investigation did counsel undertake prior to making th[e] allegation, and/or what factual support did counsel possess and rely on when pleading that Defendants Gary Roubin and Mountain Air Medical, LLC were engaged in regular and substantial business in the State of Utah at the time?
2. What factual and legal support did counsel possess and rely on for . . . the allegations . . . that Classic's employees are bound by Classic's Employee Handbook and Employee Confidentiality Agreement regardless of whether employees sign either document[?]
3. What factual and legal support did counsel possess and rely on at the time for the allegation . . . that '[b]oth Harrower and Schmid entered into each agreement [the Handbook and Confidentiality Agreement] and were bound by them[?]
4. [W]hat reasonable investigation did counsel undertake and what legal support did counsel rely on to certify to the court that the claims against Classic's former employees for breach of the Employee Handbook were warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law[?][70]

---

[67] Opposition to Attorneys' Fees at 7 (citing 948 F. Supp. 1469, 1472, 1483–84 (D. Colo. 1996)).

[68] *Id.* at 9 (citing *JIVE Com., LLC v. Wine Racks Am., Inc.*, No. 1:18-cv-49-TS-BCW, 2019 WL 1298022, at *2 (D. Utah Mar. 21, 2019)).  In Reply, Defendants argue each of Classic's cases is either detrimental to its argument or distinguishable.  *See* Dkt. 58 (Reply in Support of Attorneys' Fees) at 4–6.

[69] Dkt. 59 (Order to Show Cause re: Rule 11).

[70] *Id.* at 4–6.

Counsel responded to the Order to Show Cause on August 13, 2021.[71]  In its response to the first question, Counsel stated that before filing the Initial Complaint, they learned Harrower and Schmid "were working with Dr. Roubin to operate Mountain Air Medical, LLC."[72]  Counsel further stated that public records searches revealed Roubin "was the lead investor in Mountain Air Medical, LLC," "an air ambulance business based in Jackson, Wyoming," and that Harrower and Schmid made trips to Utah "on numerous occasions" "while working for the benefit of Mountain Air Medical, LLC, an entity funded and operated by Dr. Roubin."[73]  Counsel also stated they learned "air medical services in the Mountain States routinely cross state lines, including into Utah," and accordingly it was "extremely likely that Mountain Air Medical, LLC was flying into and out of Utah on a regular basis to set up its business and transport patients," and that it was also likely Mountain Air Medical, LLC "had . . . ongoing and extensive relationships with hospitals and facilities in Utah to sustain its air business."[74]  Counsel asserted that based on this investigation, they had a good faith belief that Roubin was engaged in regular and substantial business in Utah sufficient to allege specific personal jurisdiction.[75]

As to the second question, Counsel stated they had a reasonable basis to assert the Handbook and Confidentiality Agreement could give rise to a contract claim against both employees under *Xyngular Corp.*'s holding that a course of conduct by parties manifesting an intent to be bound is sufficient to form a contract.[76]  Counsel also acknowledged that the language in the documents disclaiming contractual liability "casts doubt regarding their

---

[71] Dkt. 65 (Response to Order to Show Cause).

[72] *Id.* at 8–9.

[73] *Id.* at 9.

[74] *Id.* at 9–10.

[75] *Id.* at 10–11.

[76] *Id.* at 13–14 (citing *Xyngular Corp.*, 2013 WL 6916525, at *2).

enforceability," but that Counsel had "a good-faith belief that these documents subjected the Defendants to obligations enforceable by Classic."[77]  Counsel further asserted that they could take this "rather aggressive" legal position while still being reasonable.[78]

As to the third question, Counsel asserted that based on their pre-filing investigation, they had a good faith basis to allege both Harrower and Schmid would have signed the Employee Confidentiality Agreement and the Employee Acknowledge Form based on Classic's account of its employee onboarding practices and inconsistent recordkeeping.[79]  Counsel further argued that because a party may become bound to a contract through performance despite lacking a formal signature, they had a good faith basis to assert breach of contract claims against Harrower as to the Confidentiality Agreement and Schmid as to the Handbook despite the lack of signatures.[80]

Finally, as to the fourth question, Counsel state that under existing Utah law, the presence of the disclaimer was not dispositive of the Handbook's enforceability because there was a factual question as to whether the disclaimer's placement was sufficiently conspicuous.[81] Counsel again cited *Reynolds*, explaining that while "Utah law allows employers to disclaim any contractual relationship that might otherwise arise from employee manuals," in *Reynolds*, a triable issue existed as to whether the employer intended to be bound, because the conspicuousness of the manual's disclaimer was ambiguous compared to other statements concerning a non-retaliation policy.[82]  Based on *Reynolds*, Counsel argue they had a reasonable

---

[77] *Id.* at 14.

[78] *Id,* (citing *Predator Int'l, Inc. v. Game Outdoor USA, Inc.*, 793 F.3d 1177, 1182 (10th Cir. 2015)).

[79] *Id.* at 16–17 (citing *Agjunction LLC v. Agrian Inc.*, No. 14-cv-2069-DDC-KGS, 2015 WL 416440, at *8 (D. Kan. Jan. 30, 2015)).

[80] *Id.* at 17 (citing *Reynolds*, 368 P.3d at 100; *Com. Union Assocs. v. Clayton*, 863 P.2d 29, 34 (Utah Ct. App. 1993)).

[81] *Id.* at 19 (citing *Reynolds*, 368 P.3d at 99–101).

[82] *Id.*

basis to allege the disclaimer language in the Handbook did not preclude a breach of contract claim. At the very least, Counsel maintain the disclaimer language was "arguably limited to governing the at-will employment relationship," meaning Harrower and Schmid could still be subject to obligations concerning the use of confidential information and trade secrets enumerated elsewhere in the Handbook.[83]

In conclusion, Counsel argued they had a good faith basis for all facts and legal contentions as asserted, and sanctions under Rule 11 would not be appropriate.

## V.    Hearing on Order to Show Cause

During the hearing on the Order to Show Cause, the court first advised Counsel that after considering their Response, it was satisfied with the explanations concerning the breach of contract claim against both Harrower and Schmid arising from the Confidentiality Agreement. However, the court stated it was still concerned that existing Utah law did not support a claim for breach of contract arising out of the Handbook. The court more specifically advised Counsel that it found no support for the contention in *Reynolds*, and it was concerned that Classic had identified no example of a case in Utah in which an employer maintained a breach of contract action against an employee arising from a employer-drafted handbook which contained a disclaimer of contractual liability. The court stated it was especially concerned because Classic had not argued at the time they sought to change or expand existing Utah law by asserting a breach of contract claim arising from the Handbook, but rather, had asserted the claim was warranted under existing law. Because the Rule 11 standard asks what a reasonable attorney would have done at the time a document was filed, not after the fact, the court questioned whether Counsel had a good faith basis to assert the breach of contract claim under existing law.

---

[83] *Id.* at 20–21.

The court also stated it was even more concerned that, based on the pre-filing investigation described in the Response, it appeared Counsel had not uncovered any facts suggesting Roubin had ties to Utah, but had asserted personal jurisdiction anyway.[84]  The court explained the Response made clear the pre-filing investigation established Roubin was a major investor in Mountain Air Medical, but that Counsel had failed to uncover evidence Roubin had any meaningful contacts with the State of Utah.  The court further explained the only reasonable inference it could draw is that despite learning this, Counsel drafted a complaint which obfuscated Roubin's lack of contacts with Utah by employing language which deliberately conflated all four Defendants for purposes of establishing personal jurisdiction, but later drew a careful distinction between Defendants Harrower and Schmid and the other Defendants.  The court then invited Classic to respond given.

Two of Classic's attorneys spoke during the hearing.  First, Brian Lutz of Gibson Dunn & Crutcher spoke.  He emphasized that at the outset of the case, both the client and attorneys felt there was unlawful conduct warranting a remedy.  Mr. Lutz asserted Counsel carefully reviewed the facts and law with their client before bringing the claims, and averred each claim had a good faith basis even if some would be met with clear defenses.  As to the claim of personal jurisdiction over Roubin, Mr. Lutz stated that because their pre-filing investigation revealed Roubin was financing Mountain Air, which "we alleged was engaged in business related to the State of Utah," there was a good faith basis to assert personal jurisdiction.[85]  He also stated that in dropping Roubin and Mountain Air from the Amended Complaint, Counsel sought to respond to the court's concerns expressed during the scheduling hearing for the TRO, as well as to

---

[84] *See* Dkt. 66 (Minute Entry for Motion for Attorneys' Fees Hearing).

[85] In response to questioning on this point, Counsel acknowledged they did not assert a theory of *respondeat superior* or alter ego in seeking to hold Roubin liable.

"streamline" the Initial Complaint by focusing on stronger claims.  As to the breach of contract

claim arising from the Handbook, Mr. Lutz asserted that between *Reynolds*, *JIVE Commerce*,[86]

and *Powell Products Inc.*, "while there were challenges in enforcing a manual and obligations

arising under it, there was room to argue and allege in good faith that notwithstanding the

disclaimer language, there existed an enforceable obligation."  He also explained it simply was

not his usual practice to attach contracts as exhibits to pleadings, and omitting the Handbook had

therefore not been a strategic choice.  He further asserted that sanctions would be inappropriate

where the claim could be resolved on the pleadings.

Next, James Magleby of Magleby Cataxinos & Greenwood spoke.  He asserted the

litigation conduct in the case was not "anywhere close to Rule 11."  He argued the timing of the

Initial Complaint and TRO were necessary to support the irreparable harm argument, and that if

they had waited until after the holiday the argument would have been weaker.  Nonetheless, he

acknowledged that he was rethinking the personal jurisdiction issue, and that he was no longer

certain that he would back that allegation if it happened today.  As to the breach of contract

claim arising from the Handbook, Mr. Magleby asserted that while the contract claim may have

been a "hard claim," it was not a frivolous claim because "there are cases that go both ways" in

terms of the enforceability of employee handbooks.  Mr. Magleby also asserted for the first time

that rather than just being warranted by existing law, the breach of contract claim was brought

with the good faith intention to expand existing Utah contract law.[87]  He further argued that, had

---

[86] Counsel did not identify *JIVE Commerce, LLC v. Wine Racks America, Inc.* in its Response to the Order to Show Cause, though the case was cited in the Memorandum in Opposition to Attorneys' Fees.  *See* Opposition to Attorneys' Fees at 9 (citing 2019 WL 1298022, at *2).  Notably, in *JIVE*, the court stated that while it can be a factual issue whether a disclaimer is specifically conspicuous, it found there was "nothing ambiguous" about the statement "This is not an employment contract" placed at the beginning of an employee handbook, and accordingly dismissed contract claims based on the handbook.  2019 WL 1298022, at *4.

[87] Mr. Magleby discussed at length how the law changes based on "hard cases," and that this was a hard case. Transcript of Oral Argument at 46:8–50:2, *Classic Aviation Holdings, et al. v. Harrower,* No: 2:20-cv-00824.

discovery proceeded, Classic might have learned the Defendants believed the Handbook formed

a contract, and, moreover, the language in the Handbook states there will be no contractual

liability "on Classic Aviation," which could allow Classic to argue the employees were bound by

the Handbook even if Classic was not.  In conclusion, Mr. Magleby stated that because of the

"ambiguity" under Utah law concerning employee handbooks, the claim was "righteous" and not

one that rose to the level of a Rule 11 sanction.

Counsel for Defendants spoke next, stating the only inference to draw from Classic's

course of litigation conduct was that the action was filed to harass Defendants as they worked to

start a competing business.  Counsel for Defendants also distinguished the cases Classic relied

on, arguing that Classic had not identified a single case in which an employer drafted a manual

containing a disclaimer of contractual liability, but then turned around and asserted the manual in

a breach of contract claim against their employee.[88]

### LEGAL STANDARD

Federal Rule of Civil Procedure 11(b) provides, in relevant part:

> By presenting to the court a pleading, written motion, or other paper—whether by
> signing, filing, submitting, or later advocating it—an attorney or unrepresented
> party certifies that to the best of the person's knowledge, information, and belief,
> formed after an inquiry reasonable under the circumstances:
>> (2) the claims, defenses, and other legal contentions are warranted by
>> existing law or by a nonfrivolous argument for extending, modifying, or
>> reversing existing law or for establishing new law;
>> (3) the factual contentions have evidentiary support or, if specifically so
>> identified, will likely have evidentiary support after a reasonable
>> opportunity for further investigation or discovery[.][89]

---

[88] In rebuttal, Mr. Magleby emphasized the court should end its inquiry because there was an explanation for each example of Classic's litigation conduct that concerned the court, and a broader inference should not be drawn from Classic's overall course of conduct.

[89] Fed. R. Civ. P. 11(b).

Under Rule 11(c), "[i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."[90]  A court may impose sanctions *sua sponte* if it first orders the attorney, law firm, or responsible party to "show cause why conduct specifically described in the order has not violated Rule 11(b)."[91]  Additionally, "district courts may enforce Rule 11 even after the plaintiff has filed a notice of dismissal under Rule 41(a)(1)."[92]

The Supreme Court, interpreting Rule 11, has stated:

[T]he central purpose of Rule 11 is to deter baseless filings in district court and thus, consistent with the Rules Enabling Act's grant of authority, streamline the administration and procedure of the federal courts.  Rule 11 imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and not interposed for any improper purpose. An attorney who signs the paper without such a substantiated belief shall be penalized by an appropriate sanction.[93]

The Tenth Circuit has further observed: "Baseless filing puts the machinery of justice in motion, burdening courts and individuals alike with needless expense and delay."[94]

In the Tenth Circuit, courts evaluate potential Rule 11 violations in two steps.  First, the district court determines if a pleading violates Rule 11, which "typically involves subsidiary findings, such as the current state of the law or the parties' and attorneys' behavior and motives

---

[90] *Id.* 11(c)(1).

[91] *Id.* 11(c)(3).

[92] *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990).

[93] *Id.* at 393 (internal citations and quotations omitted).

[94] *Collins v. Daniels*, 916 F.3d 1302, 1323 (10th Cir. 2019) (citing *Cooter*, 496 U.S. at 398).

within the context of the entire litigation."[95]  Second, if the court determines there has been a Rule 11 violation, the district court "impose[s] an appropriate sanction."[96]

Under the first step, courts use the "objective reasonableness" standard to evaluate litigation conduct.  To determine whether conduct is objectively reasonable, the court asks "whether a reasonable attorney admitted to practice before the district court would file such a document."[97]  If "after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law, then such conduct is sanctionable under Rule 11."[98]  Put more plainly, an attorney "must stop, look, and listen before signing a document subject to Rule 11."[99]  This inquiry also recognizes that "our adversary system expects lawyers to zealously represent their clients," and accordingly, "an attorney can be rather aggressive and still be reasonable."[100]

The Tenth Circuit has further explained that "[t]he focus of Rule 11 is narrow," in that it "relates to the time of signing of a document and imposes an affirmative duty on each attorney and each party . . . to conduct a reasonable inquiry into the validity and accuracy of a document before it is signed."[101]  Indeed, "[a] signature sends a message to the district court that this

---

[95] *Adamson v. Bowen*, 855 F.2d 668, 672 (10th Cir. 1988).  *See also Crabtree By & Through Crabtree v. Muchmore*, 904 F.2d 1475, 1478–79 (10th Cir. 1990) (evaluating plaintiffs' conduct within the context of related state court litigation and imposing Rule 11 sanctions).

[96] *Adamson*, 855 F.2d at 672.

[97] *Id.* at 673 (citation omitted).

[98] *Id.* (citation omitted).

[99] *Id.* (internal citation and quotation omitted).

[100] *Collins*, 916 F.3d at 1320 (citation omitted).

[101] *Eisenberg v. Univ. of N.M.*, 936 F.2d 1131, 1134 (10th Cir. 1991) (citation omitted).

document is to be taken seriously."[102]  Accordingly, the "practice of pleading first and analyzing later is prohibited by Rule 11."[103]

Under the second step, if the court determines a Rule 11 violation has occurred, it imposes "an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."[104]  As the Tenth Circuit has explained, "Rule 11 does not provide any 'free passes' to litigants who violate its mandate.  Once a court finds a Rule 11 violation it must impose some form of sanction."[105]  "The appropriate sanction should be the least severe sanction adequate to deter and punish the [offender]."[106]  In imposing sanctions under Rule 11, courts recognize that sanctions "serve several purposes, including (1) deterring future litigation abuse, (2) punishing present litigation abuse, (3) compensating victims of litigation abuse, and (4) streamlining court dockets and facilitating case management."[107]

Sanctions come in many forms, and a district court has "discretion to tailor sanctions to the particular facts of the case."[108]  A district court judge has significant discretion, even "creativity," in deciding which sanction "best fits a particular case or best responds to a

---

[102] *Id.* (quoting *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 546 (1991)).

[103] *Arbuckle Wilderness, Inc. v. KFOR TV, Inc.*, 76 F.3d 392, at *3 (10th Cir. 1996) (table decision) (citing *Coffey v. Healthtrust, Inc.*, 1 F.3d 1101, 1104 (10th Cir. 1993)).

[104] Fed. R. Civ. P. 11(c)(1).  The Rule further provides that "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee."  *Id.*

[105] *Eisenberg*, 936 F.2d at 1136 (citation omitted).

[106] *White v. Gen. Motors Corp., Inc.*, 908 F.2d 675, 684 (10th Cir. 1990).

[107] *Id.* at 683.

[108] Fed. R. Civ. P. 11 advisory committee's note to 1983 amendment; *see also Anderson v. Beatrice Foods*, 900 F.2d 388, 394 (1st Cir. 1990) ("The trial judge is best positioned to decide what sanction best fits a particular case or best responds to a particular episode or pattern of errant conduct.").

particular episode or pattern of errant conduct."[109]   However, monetary sanctions may not be imposed if the court's show-cause order arose after a case is voluntarily dismissed.[110]

## ANALYSIS

As a threshold issue, the court notes the prerequisites of Rule 11(c) have been met: the court ordered Counsel to show cause why specific conduct in this litigation did not violate Rule 11(b)(2) and 11(b)(3),[111] and Counsel responded to the Order to Show Cause.[112]   Additionally, oral argument was held, allowing Counsel to further respond to the court's concerns as stated in the Order to Show Cause.[113]   Accordingly, the court may now determine whether Rule 11(b) has been violated, and, if so, impose an appropriate sanction.

First, the court determines whether Counsel's factual assertion that the court had personal jurisdiction over Roubin violated Rule 11(b)(3).   Second, the court determines whether Counsel violated Rule 11(b)(2) in asserting there was a basis under Utah law to bring a breach of contract claim arising from the Handbook.   Third, the court determines which sanctions are available and appropriate for any violations.   Fourth and finally, the court turns to Defendants' Motion for Attorneys' Fees.

---

[109] *Anderson*, 900 F.2d at 394 (citing Fed. R. Civ. P. 11 advisory committee's note to 1983 amendment).

[110] Fed. R. Civ. P. 11(c)(5)(B) (the court may not impose monetary sanctions "on its own, unless it issued the show-caused order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned."); *see also AeroTech Inc. v. Estes*, 110 F.3d 1523, 1529 (10th Cir. 1997) (holding that under the plain language of Rule 11, monetary sanctions cannot be awarded on the court's initiative if claims have been voluntarily dismissed before the show-cause order) (internal citation and quotation omitted).

[111] *See* Order to Show Cause.

[112] *See* Response to Order to Show Cause.

[113] *See* Dkt. 66 (Minute Entry for Motion Hearing re: Order to Show Cause).

# I.     The Assertion That the Court Had Personal Jurisdiction Over Roubin Violated Rule 11

For the reasons stated below, the court concludes Counsel's assertions that Roubin purposefully availed himself of Utah and the court had personal jurisdiction over him violated Rule 11(b)(3).

In Classic's Initial Complaint filed in conjunction with its Motion for TRO, Classic asserted this court had personal jurisdiction over all the named Defendants, including Roubin, "because Defendants are engaged in regular and substantial business in the State of Utah and the District of Utah."[114]  Following this general statement, Classic drew a careful distinction between the Defendants, explaining that Defendants Harrower and Schmid specifically "traveled to and/or directed their activities into this jurisdiction in connection with their employment."[115] There is no such language explaining Roubin's contacts to this jurisdiction.  While the Initial Complaint alleges on information and belief that Roubin is "the principal financial backer of Mountain Air Medical, LLC,"[116] that Roubin had invested "at least $2,100,000 in Mountain Air Medical,"[117] and that Roubin stood to gain financially from the provision of medical services by Mountain Air Medical,[118] it also alleges Mountain Air is a Wyoming corporation with its principal place of business in Jackson, Wyoming.[119]  In short, other than the generalization stating Defendants conducted business in Utah, there is not a single stated fact or allegation anywhere in the Initial Complaint directly connecting Roubin to Utah.

---

[114] Initial Complaint ¶ 15.

[115] *Id.*

[116] *Id.* ¶ 13.

[117] *Id.* ¶ 59.

[118] *Id.* ¶¶ 60–62.

[119] *Id.* ¶ 12.

In response to the court's Order to Show Cause, Counsel state they "conducted numerous phone calls with senior business leaders at Classic" and engaged in "independent research" before filing the Initial Complaint, which confirmed that Roubin was the lead investor in Mountain Air Medical, an air ambulance business based in Wyoming.[120]  Although Roubin is a resident of Wyoming and Alabama, Counsel contend that because "air medical services in the Mountain States routinely cross state lines, including into Utah" and because Harrower and Schmid both traveled to Utah on numerous occasions while working for the benefit of Mountain Air Medical, Counsel had a good faith belief that Roubin was also engaged in regular and substantial business in the State of Utah—sufficient to assert specific personal jurisdiction.[121]

Under longstanding Supreme Court precedent concerning specific personal jurisdiction, a defendant must "purposefully avail" themselves of a state to be haled into court there.[122]  The "constitutional touchstone" of this inquiry is "whether the defendant purposefully established minimum contacts in the forum state," such that it is foreseeable "he should reasonably anticipate being haled into court there."[123]  "Those contacts must be the defendant's own choice and not 'random, isolated, or fortuitous.'"[124]  "They must show that the defendant deliberately reached out beyond its home—by, for example, exploiting a market in the forum State or

---

[120] *See* Response to Order to Show Cause at 8–9.

[121] *Id.* at 9–11.

[122] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *see also Hanson v. Denckla*, 357 U.S. 235, 253 (1959) (the defendant must take "some act by which [he] personally avails [himself] of the privilege of conducting activities within the forum state.").

[123] *Burger King Co.*, 471 U.S. at 474 (citations omitted).

[124] *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (citing *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)).

entering a contractual relationship centered there."[125]  Finally, the asserted claims must arise out of or relate to the defendant's contacts with the forum.[126]

Applied here, Classic needed to allege the claims against Roubin arose out of or related to his contacts with the State of Utah.  While personal jurisdiction need not be conclusively proven at the pleading stage, Counsel needed a reasonable factual basis to allege that Roubin as an individual—aside from Harrower, Schmid, and Mountain Air Medical—had purposefully availed himself of the State of Utah or had deliberately reached out beyond his home state to take some action in Utah.  Counsel drafting the Initial Complaint knew they had no legitimate factual basis to make such an allegation, but nonetheless asserted a claim of specific personal jurisdiction over Roubin.

The court can only conclude that Counsel violated Rule 11(b) by asserting personal jurisdiction over Roubin through reliance on an inaccurate generalization of his business practices.  The court looks to the time a pleading was signed and determines whether a reasonable attorney would have signed the document given the facts, circumstances, and governing law as understood at that time.[127]  Again, "pleading first and analyzing later is prohibited by Rule 11."[128]  The court finds a reasonable attorney would not have signed the Initial Complaint's allegations concerning personal jurisdiction over Roubin because Counsel possessed, and the pleading contained, no bona fide facts or assertions directly supporting Roubin's connection to the State of Utah.  Counsel's Response to the Order to Show Cause

---

[125] *Id.* (citing *Walden v. Fiore*, 571 U.S. 277, 285 (2014)) (cleaned up).

[126] *Id.* (citing *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 137 S. Ct. 1773, 1780 (2017)).

[127] *Eisenberg*, 936 F.2d at 1134.

[128] *Arbuckle Wilderness, Inc.*, 76 F.3d at 392.

indicates their pre-filing investigation did not reveal any facts tying Roubin to Utah.[129]

Undeterred, Counsel nevertheless drafted a complaint which alleged personal jurisdiction over

Roubin using vague language that included all Defendants, while including no specific facts

tying Roubin to Utah.  As the Tenth Circuit held in a similar case, "sanctions are appropriate . . .

not because plaintiffs failed to inquire into the facts of their claims, but because they failed to act

reasonably given the results of their inquiries."[130]

Counsel's arguments to the contrary are unavailing.  In the Response, and at oral

argument, Counsel argued the fact Roubin was a major investor in Mountain Air created a good

faith basis to assert the State of Utah possessed personal jurisdiction over Roubin.[131]  However,

Supreme Court case law is clear that personal jurisdiction is only established when a specific

defendant reaches into the forum state and purposefully avails himself of activities within the

state.[132]  The fact that Harrower and Schmid were doing so to form Mountain Air Medical does

not provide a factual basis to assert Roubin, the investor, also specifically availed himself of

Utah.[133]

---

[129] *See King v. Fleming*, 899 F.3d 1140, 1148 (10th Cir. 2018) (if a party has knowledge or "strong indicators" that a factual assertion is unwarranted, a Rule 11 violation inheres where the party does not undertake a reasonable inquiry before asserting that fact in a signed paper);  *Laurino v. Tate*, 220 F.3d 1213, 1218 (10th Cir. 2000) (upholding sanctions when allegations made without evidentiary support or showing that investigation or discovery would lead to evidence supporting the allegation); *Mountain Crane Serv., LLC v. Wennesshiemer*, No. 2:15-cv-00408-DN-EJF, 2016 WL 5415665, at *3 (D. Utah Sept. 28, 2016) (finding a Rule 11(b)(3) violation where facts known to the party at the time it filed a document were misstated).

[130] *White*, 908 F.2d at 682.

[131] *See* Response to Order to Show Cause at 9–11.

[132] *See Ford Motor Co.*, 141 S. Ct. at 1025.

[133] Moreover, as counsel for Defendants acknowledged at oral argument, the Initial Complaint and Motion for TRO both alleged that Mountain Air Medical had not yet begun operations.  *See* Initial Complaint ¶ 5 ("Defendants intend to launch their unlawful operation in Jackson Hole as soon as December 2020."); Motion for TRO at 2 (same). Indeed, that was the basis for the emergency TRO requested—to prevent Mountain Air Medical from launching. Accordingly, the explanation in the Response to the Order to Show Cause that air ambulatory services routinely cross state lines is unhelpful, since by Classic's own account Mountain Air Medical would not yet have been transporting patients.  *See* Response to Order to Show Cause at 10 (asserting "it is extremely likely that Mountain Air Medical, LLC was flying into and out of Utah on a regular basis to set up its business and transport patients"). Accordingly, Classic's assertion it made reasonable inferences based on facts available at the time is unavailing,

Additionally, dropping Roubin and Mountain Air Medical from the Amended Complaint does not cure the violation.  Counsel repeatedly asserted during oral argument that if Defendants had brought a motion for sanctions under Rule 11(c)(2), and Classic then dropped Roubin from the Initial Complaint, under the "safe harbor" provision of Rule 11(c)(2), sanctions would not have been available.[134]  While the court recognizes Classic's attempt to cure the harm caused, Rule 11(c)(3) does not contain such a safe harbor provision.[135]  Rule 11(b)(3) requires that at the time a fact is asserted, an attorney has an affirmative duty to make a reasonable inquiry into the facts, and only assert facts that he or she has evidentiary support for.[136]  That the rule was amended to add a safe harbor provision when Rule 11 motions are filed by adversaries[137] does not abrogate or undermine the essential purpose and meaning of Rule 11.  At the time the Initial Complaint was filed, Counsel knew they possessed no facts tying Roubin to Utah, but nevertheless asserted an unsupported fact to allege personal jurisdiction anyway.  The later attempt to cure the harm by removing Roubin from the Amended Complaint cannot undo the initial wrong.[138]  Accordingly, the court concludes Counsel violated Rule 11(b)(3) when they asserted in the Initial Complaint that Roubin had "regular and substantial business in the State of Utah and the District of Utah."[139]

---

because it was not reasonable to infer an air ambulatory business not yet in operation was routinely crossing state lines into Utah, let alone that Roubin was personally availing himself of Utah on that basis.

[134] *See* Minute Entry for Motion for Attorneys' Fees Hearing; *see also* Response for Order to Show Cause at 11 (arguing that the removal of Roubin from the Amended Complaint cuts against a finding of bad faith).

[135] *See* Fed. R. Civ. P. 11(c)(3).

[136] *Id.* 11(b)(3); *Eisenberg*, 936 F.2d at 1134.

[137] Fed. R. Civ. P. 11(b) advisory committee's notes to 1993 amendment (discussing new safe harbor provision).

[138] Of course, by that time the harm to Roubin had already been inflicted.  Counsel caused him to retain counsel in Utah, a forum he had no connection to, on two days' notice, the week of Thanksgiving, to defend a suit in a jurisdiction in which he could not properly be haled.

[139] Initial Complaint ¶ 15.

## II.    The Assertions of a Breach of Contract Claim Arising from the Confidentiality Agreement and Employee Handbook Did Not Violate Rule 11

For the reasons stated below, the court concludes that Counsel did not violate Rule 11(b)(2) when they asserted a breach of contract claim arising from the Confidentiality Agreement and Handbook.

In its Initial Complaint, Classic alleged the Employee Handbook contained an acknowledgement form that Defendant Harrower signed.[140]  Classic further alleged its employees are bound by the Confidentiality Agreement, which Defendant Schmid signed.[141] Classic claimed that both the Handbook and Confidentiality Agreement "are valid and enforceable contracts governed by the laws of the State of Utah," and that "[b]oth Harrower and Schmid entered into each agreement and were bound by them."[142]  In the Motion for TRO, Counsel further asserted there was a "substantial" likelihood of success of the merits of its claims, including the breach of contract claim.[143]  In the Order to Show Cause, the court directed Counsel to provide the factual and legal support relied on for the following three propositions asserted in the Initial Complaint that: (1) Classic's employees are bound by the Handbook and the Confidentiality Agreement regardless of whether they signed either document, (2) Harrower was bound by the Confidentiality Agreement and Schmid was bound by the Handbook, and finally, (3) claims for breach of contract arising from the Handbook were warranted by existing law or a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.[144]

---

[140] *Id.* ¶¶ 33–34.

[141] *Id.* ¶¶ 35–36.

[142] *Id.* ¶ 76.

[143] Motion for TRO at 12.

[144] Order to Show Cause re: Rule 11 at 4–5.

Having reviewed Classic's Response to the Order to Show Cause, the court concludes Counsel had a good faith basis to assert a breach of contract claim arising out of the Confidentiality Agreement against Schmid (who was alleged to have signed the Agreement) and Harrower (who was not alleged to have signed the Agreement).  The court accepts and credits Counsel's explanation that based on their pre-filing investigation, they learned all Classic employees are presented with and asked to sign the Confidentiality Agreement as a condition of employment, but that because Classic's record keeping was inconsistent, it could not locate a record of Harrower signing the agreement.[145]  Because Counsel had a reasonable basis to allege that both Harrower and Schmid had signed the Confidentiality Agreement, the breach of contract claim arising from that document was reasonable.

Likewise, although the court is concerned about the evolution of Counsel's account of the authority supporting the breach of contract claim arising from the Handbook, it concludes Counsel's assertion the breach of contract claim was at least minimally warranted under existing Utah law and does not rise to the level of a Rule 11 violation..[146]  Counsel primarily rely on two cases, *Xyngular Corp. v. Innutra, LLC*[147] and *Reynolds v. Gentry Financial Corporation and Royal Management*,[148] to argue the Handbook claim was supported by Utah law.  First, Counsel argue that under Utah law as explained in *Xyngular*, "a contract is formed where there is 'a manifestation of mutual assent, by words or actions or both, which reasonably are interpretable

---

[145] Response to Order to Show Cause at 12–13.  The court also accepts Classic's explanation that it had a good faith basis to assert Schmid signed the Handbook's Acknowledgement Form.  However, as discussed *infra*, the court concludes Classic did not have a colorable legal basis on which it could assert the Handbook formed the basis of a contract with either Harrower or Schmid.

[146] *See* Response to Order to Show Cause at 19–21.

[147] No. 2:13-cv-685-TS, 2013 WL 6916525 (D. Utah Nov. 20, 2013).

[148] 368 P.3d 96 (Utah Ct. App. 2016).

as indicating an intention to make a bargain.'"[149]  The court in *Xyngular* found breach of contract claims adequate where the plaintiff alleged the parties agreed on terms, began operating under those terms, and believed they were in a contractual relationship, even when the agreement was never signed or reduced to writing.[150]  Counsel argue they "reasonably relied on this persuasive authority . . . and a good-faith belief that employees are not free to betray their employer and misuse confidential company information for their own purposes" in basing breach of contract allegations on the Handbook.[151]  Additionally, Counsel rely on *Reynolds* for the proposition that "an employee manual may create a unilateral contract," regardless of whether it is signed by the employee.[152]  More specifically, because the court in *Reynolds* held a "triable issue" existed as to whether a contract was formed by a manual when it contained a disclaimer but also prominent language concerning a non-retaliation provision, Counsel assert they had a reasonable basis to allege the Handbook created a contract despite its disclaimer language.[153]  Counsel further state that the disclaimer language in the Handbook "arguably govern[s] only the at-will employment relationship," and not any other provisions, including those concerning confidential information.[154]

Rule 11 requires that any "claims, defenses, and other legal contentions" presented to the court must be "warranted by existing law or by a nonfrivolous argument for extending,

---

[149] Response at 13 (quoting *Xyngular*, 2013 WL 6916525, at *2).

[150] *Id.* (citing *Xyngular*, 2013 WL 6916525, at *2).

[151] *Id.* at 13–14.

[152] *Id.* at 17 (citing *Reynolds*, 368 P.3d at 100).

[153] *Id.* at 19 (citing *Reynolds*, 368 P.3d at 101).

[154] *Id.* at 20.  At oral argument, Counsel also relied on *Jive Commerce, LLC v. Wine Racks America, Inc.*, which held a disclaimer in an employee manual was sufficiently conspicuous to disclaim liability when the disclaimed was placed at the beginning of the employee handbook and stated: "This is not an employment contract."  No. 1:18-cv-49-TS-BCW, 2019 WL 1298022, at *4 (D. Utah Mar. 21, 2019).

modifying, or reversing existing law or for establishing new law."[155]  In their Response to the

Order to Show Cause, Counsel asserted their claims were warranted by existing Utah law.[156]  A

claim lacks merit when its proponent "provide[s] no case law or reasoning to support" its legal

theory, or when there is "an abundance of case law prohibiting" the assertion of the claim, and

may be found frivolous if the court concludes "a reasonable and competent attorney would not

believe in [its] merits."[157]

The court is extremely skeptical of breach of contract claims in which an employer seeks

to enforce an employment manual, which it drafted, against an employee, where that manual

includes an explicit disclaimer that it is not a contract.  However, the court concludes pleading

the claim did not rise to the level of violating Rule 11 because Counsel provided some case law

and reasoning to support its legal theory.  *Xyngular* stands for the proposition a course of

conduct can evidence the formation of a contract, even where the contract is not reduced to

writing.[158]  *Xyngular* does not support the proposition a course of conduct can form a contract

where a written document concerning the same conduct explicitly states it is not a binding

contract.  However, it does not exclude that possibility, even if it seems unlikely such a claim

---

[155] Fed. R. Civ. P. 11(b)(2).

[156] *See* Response to Order to Show Cause at 19–21.  At oral argument, while continuing to argue *Xyngular* and *Reynolds* provided support for the breach of contract claim under existing Utah law, Counsel also asserted for the first time they had a good-faith basis to argue for an extension of the Utah law of contracts arising out of manuals. The Advisory Committee Notes to Rule 11 explain that when arguments for a change of law are specifically identified along with their support "even in minority opinions, in law review articles, or through consultation with other attorneys," that contention should be viewed with "greater tolerance" under the Rule.  Fed. R. Civ. P. 11 advisory committee's notes to 1993 amendment.  But because Counsel did not present this argument any earlier than oral argument—and asserted when the Motion for TRO was filed Classic was substantially likely to succeed on its Breach of Contract Claims under existing Utah law—the court does not rely on the more lenient standard.  *See* Motion for TRO at 13–14 (citing *Xyngular*, 2013 WL 6916525, at *2).

[157] *Dodd Ins. Servs., Inc.*, 935 F.2d at 1157; *see also Berwick Grain Co., Inc. v. Ill. Dep't of Ag.*, 217 F.3d 502, 504 (7th Cir. 2000) ("[F]or Rule 11 purposes a frivolous argument is simply one that is baseless or made without a reasonable and competent inquiry.") (internal citation and quotation omitted).

[158] *Xyngular*, 2013 WL 6916525, at *2.

would eventually succeed under Utah law.[159]  Similarly, *Reynolds* supports the proposition a breach of contract claim can arise from an employee handbook, and that the conspicuousness of the disclaimer can be a triable issue, although in that case, an employee sought to enforce the manual against her employer.[160]  While Counsel have provided no Utah cases supporting the proposition an employer may draft a handbook containing a disclaimer of contractual liability and then seek to enforce that handbook against their employee in a breach of contract claim, that possibility has not been expressly foreclosed by Utah courts.[161]  While the court remains deeply skeptical about such a claim being viable given the context in which Utah law came to recognize employment manuals may form contracts for limited purposes,[162] and is concerned about the evolution of Counsel's explanation for its basis for the breach of contract claim, it finds Counsel's assertion of a breach of contract claim arising from the Handbook does not quite rise

---

[159] Utah law is clear that where a document could conceivably establish the elements of an enforceable contract, but the factfinder determines the document expressly states it is not a contract, a breach of contract claim will not succeed. *See, e.g.*, *Rossi v. Univ. of Utah*, 496 P.3d 105, 114 (Utah 2021) (citing Restatement (Second) of Contracts § 21 & cmt. b).

[160] 368 P.3d at 101.

[161] In its Opposition to the Motion for Attorneys' Fees, Classic cites a District of Colorado case, interpreting Colorado law, which held that a handbook containing a disclaimer concerning at-will employment could still conceivably form a contract.  *See Powell Prods., Inc*, 948 F. Supp. at 1483–1484.

[162] *Reynolds* is one in a series of Utah cases recognizing an exception to the general rule that employment is at-will. Beginning with *Berube v. Fashion Ctr.*, Utah courts recognized that when an employee relies on an employer's statement that termination will only be for cause, an implied-in-fact contract may be recognized, including one arising from an employment manual.  *See* 771 P.2d 1033, 1044–46 (Utah 1989); *see also Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 56 (Utah 1991); *Johnson*, 818 P.2d at 1000–02; *Tomlinson v. NCR Corp.*, 345 P.3d 523, 526–27 (Utah 2014).  Following these cases, Utah courts also recognized that where an employer expressly states in writing that employment is at-will, that statement will supersede any earlier communication to the contrary.  *See, e.g.*, *Ryan*, 972 P.2d at 401–02; *Tomlinson*, 345 P.3d at 529–30; *Trembly v. Mrs. Fields Cookies*, 884 P.2d 1306, 1312–13 (Utah Ct. App. 1994); *Hamilton*, 904 P.2d at 1112–13; *Reynolds*, 368 P.3d at 101.  Given this history, the court is unaware of any Utah case law in which an employer drafts a manual including a disclaimer of contractual liability but then seeks to enforce that manual for some other purpose, and such a case would seem to cut against the reasons the doctrine developed in the first place.  However, Utah case law does not foreclose this possibility, and the District of Utah, applying Utah law, has acknowledged it.  *See First Am. Title Ins. Co.*, 2016 WL 6902473, at *23 (inferring that "if the handbook becomes part of the employee's employment contract, the employer is also able to enforce contractual obligations borne from employee manuals and handbooks."); *but see Bahnmaier v. N. Utah Healthcare Corp.*, 402 P.3d 796, 800 (Utah Ct. App. 2017) (holding that a disclaimer of contractual liability prevented a later-adopted Substance Use Policy from functioning as an implied-in-fact contract).

to the level of a Rule 11 violation.  Accordingly, the court concludes Counsel did not violate Rule 11(b)(2).

### III.   The Court Declines to Impose Further Sanctions

Under Rule 11, if the court determines there has been a violation, it "may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation."[163]  Bearing in mind the goal of sanctions is to deter future litigation abuse, and recognizing monetary sanctions are unavailable because the case was voluntarily dismissed prior to the court's show-cause order,[164] the court determines under the circumstances here the publication of this Memorandum Decision and Order identifying by name the law firms and lawyers involved serves as a public admonition sufficient to give effect to the policies underlying Rule 11.  The court credits Counsel's statements at oral argument that they seek to learn from this experience and do better in the future.

The court notes it has an inherent obligation to ensure that parties and lawyers at all times comply with the rules governing litigation of federal court proceedings.  The court exists to serve the public, protect the judicial process, and preserve the public's faith in that process.  Citizens are not supposed to be haled into court from anywhere in the country unless that court has a reasonable basis to assert personal jurisdiction over them.   The court acknowledges Counsel's statement at oral argument that lawyers must balance their duty to zealously advocate for the clients along with their duty as officers to the court.  But due to our adversarial system, the court must rely on lawyers as officers of the court to accurately and faithfully present the facts,

---

[163] Fed. R. Civ. P. 11(c)(1).  The rule also states: "Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee."  *Id.*

[164] *Id.* 11(c)(5)(B) (the court may not impose monetary sanctions "on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims made by or against the party that is, or whose attorneys are, to be sanctioned"); *see also AeroTech Inc.*, 110 F.3d at 1529.

especially when it comes to invoking the court's limited jurisdiction.  When lawyers run afoul of that obligation, the court has a responsibility to enforce the rules—indeed, it is the only entity that can.[165]

The rules and standards that govern court proceedings are vital in ensuring fairness to all parties who appear before the court.  But those rules only matter if they are enforced.

## IV.   Defendants' Motion for Sanctions and Attorneys' Fees is Denied

Finally, the court turns to Defendants' Motion for Attorneys' Fees.  For the reasons explained below, the Motion is denied.

Defendants' Motion seeks an award of attorneys' fees pursuant to the court's inherent authority to assess such fees when a party acts "in bad faith, vexatiously, wantonly, or for oppressive reasons."[166]  As a threshold issue, the court notes a party may seek attorneys' fees under the court's inherent authority after a voluntary dismissal under Rule 41, even though the court had no authority to impose monetary sanctions under Rule 11 following such a dismissal.[167]

Under the "bedrock principle known as the 'American Rule,'" "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise."[168]  Applying the "bad faith" exception to the American Rule, a court may permit the assessment of fees "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons."[169]  This

---

[165] As Counsel stated at oral argument, the Federal Rules do not need to be changed to encourage lawyers to act ethically, but rather, existing rules must be enforced.

[166] Motion for Attorneys' Fees at 5 (citing *Rogler v. Standard Ins. Co.*, 30 F. App'x 909, 914 (10th Cir. 2002)).

[167] *See, e.g.*, *Lundahl v. Halabi*, 600 F. App'x 596, 606 (10th Cir. 2014); *Xlear, Inc. v. Focus Nutrition, LLC*, 893 F.3d 1227, 1236 (10th Cir. 2018).

[168] *Kornfeld v. Kornfeld*, 393 F. App'x 575, 578 (10th Cir. 2010) (citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 253 (2010)).

[169] *Id.* (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991)).

exception "reaches a court's inherent power to police itself and serves the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy."[170]  "A party acts in bad faith only when the claim brought is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons."[171]  The bad faith exception is construed narrowly and "resorted to only in exceptional cases . . . when there is clear evidence that challenged actions [were] taken" in bad faith.[172]

Defendants argue the fact Classic's contract claims "had no factual and legal basis," coupled with the fact Classic did not attach the Handbook containing the disclaimer provisions to either the Initial Complaint or Amended Complaint, "compel the conclusion that Classic was acting in bad faith, vexatiously, wantonly and for oppressive reasons."[173]  Classic responds that its contract claims were colorable,[174] and Defendants fail to identify facts, acts, or omissions supporting an allegation of bad faith.[175]  In particular, Classic points out it was under no obligation to attach the Handbook as an exhibit to the Initial Complaint, and that it became a part of the record in the case on December 28, 2020 with the filing of Defendants' Motion to Dismiss.[176]

---

[170] *Id.* (internal citations and quotations omitted).

[171] *Sterling Energy, Ltd. v. Friendly Nat'l Bank*, 744 F.2d 1433, 1435 (10th Cir. 1984) (internal quotation and citation omitted).

[172] *Fed. Deposit Ins. Corp. v. Schuchmann*, 319 F.3d 1247, 1250 (10th Cir. 2003) (internal quotation and citation omitted).

[173] Motion for Attorneys' Fees at 8.

[174] *See* Opposition to Motion for Attorneys' Fees at 5–8.

[175] *Id.* at 8–10.

[176] *Id.* at 9 (citing *JIVE Com., LLC*, 2019 WL 1298022, at *2).

The court has already concluded Classic's contract claims arising out of the Handbook were dubious.  While the court has concerns with Classic's litigation conduct, it does not conclude the conduct was egregious enough to support a finding of bad faith.[177]  In particular, the court takes into account the following facts: Classic had a relatively short (two-week) window to prepare the Initial Complaint and Motion for TRO,[178] Classic consistently asserted it believed Defendants acted dishonestly in working to begin their own company even while they worked for Classic,[179] Classic acknowledged the contract claim against Harrower based on the Handbook was "weaker,"[180] litigation was only pending before the court for seven months, and Classic removed Defendants Roubin and Mountain Air from the Initial Complaint after the court expressed concerns over its jurisdiction,[181] suggesting an attempt to cure the harm caused by the Initial Complaint.

In short, although the court finds Classic has violated Rule 11, it does not find that its conduct rises to the level of bad faith as would be necessary to award attorneys' fees under the exception to the American Rule.  Accordingly, Defendants' Motion for Attorneys' Fees is denied.

## CONCLUSION

For the reasons stated above, the court finds Classic's Counsel violated Rule 11(b)(3) by asserting the court had personal jurisdiction over Defendant Roubin but declines to impose

---

[177] *See, e.g.*, *Chambers*, 501 U.S. at 58 (finding sanctions warranted under court's inherent power based on litigant's "relentless, repeated fraudulent and brazenly unethical efforts").

[178] See Motion for TRO at 2.

[179] *See* Initial Complaint ¶¶ 1–5; Opposition to Motion to Dismiss at 7; Opposition to Motion for Attorneys' Fees at 2–3; Response to Order to Show Cause at 14.

[180] *See* Opposition to Motion for Attorneys' Fees at 6.

[181] *See* Amended Complaint.

sanctions.  The court also finds that Classic's actions were not so vexatious and wanton as to

merit an award of attorneys' fees under the bad faith exception to the American Rule, and

accordingly, Defendants' Motion for Attorneys' Fees[182] is DENIED.

SO ORDERED this 30th day of September, 2022.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[182] Dkt. 55.